**WILCOX MANUFACTURING COMPANY, Appellant,**

v.

**EASTERN GAS AND FUEL ASSOCIATES, Appellee.**

**JEFFREY GALION MANUFACTURING COMPANY, Appellee**

v.

**WILCOX MANUFACTURING COMPANY, Appellant.**

**Nos. 11963, 11964.**

United States Court of Appeals Fourth Circuit.

Argued April 3, 1968.

Decided July 18, 1968.

Certiorari Denied Jan. 20, 1969.

See 89 S.Ct. 691.

John W. Malley and William K. West, Washington, D. C. (Raymond F. Lippitt, and Cushman, Darby & Cushman, Washington, D. C., on the brief) for appellant.

John M. Webb, Pittsburgh, Pa. (William H. Webb, and Webb, Burden, Robinson & Webb, Pittsburgh, Pa., David D. Johnson, and Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., and David Young, Columbus, Ohio, on the brief) for appellees.

Before BRYAN, WINTER and BUTZNER, Circuit Judges.

**ALBERT V. BRYAN, Circuit Judge:**

Coal mining patents owned by Wilcox Manufacturing Company, a West Virginia corporation, were set at naught by the District Court and the company appeals. The successful parties were the appellees, Eastern Gas and Fuel Associates, chartered in Massachusetts, and Jeffrey Galion Manufacturing Company, chartered in Ohio. We affirm.[1]

The apparatus patent—the dominant one here—is No. 3,026,098, issued March 20, 1962 and the other is No. 2,967,701, termed a method patent, issued January 10, 1961. The original application was made August 16, 1954 and was rekindled from time to time by amendments until the issuance of the patents in suit. Both stem from the renewal of May 6, 1957, a division of it leading to the method letters. The specifications of the 1957 renewal, with unimportant additions, have been carried into the patents now questioned.

I. The machine excavates coal by boring into the seam with two parallel augers. Equipped with a bit on the end, the shaft of each auger is helical, that is screw-shaped or spiraled. As the coal is cut and loosened, the screw blades act as a worm, withdrawing and gathering the coal, and delivering it rearwardly. It is called a "continuing miner" because it performs these functions without interruption while it is moved along the face of the stratum by a winch, cables and pulleys. The mechanism is described with simplicity by the District Court as:

"* * * comprised of a frame carrying a power plant and conveyor and having a pair of cutting and conveying helical augers disposed forwardly of the frame which augers are horizontally spaced from each other, *rotating* in opposite directions, longitudinally *reciprocated* and *vertically adjustable.*

---

1. This is a consolidated appeal of two actions tried together. In one Wilcox was the unsuccessful plaintiff against Eastern Gas and Fuel Associates for alleged infringement of both its method and apparatus patents (respectively 2,967,701 and 3,026,098). In the other suit Jeffrey as plaintiff sought a declaratory judgment that these two Wilcox patents were invalid.

"The machine is designed so that it can be 'sumped in' [i. e. forced] to the face of the coal, and then moved transversely across the face, cutting the coal to the height of the vein, and continuously conveying the coal so cut outwardly to a point to the rear of the machine where it can be picked up and further conveyed by other auxiliary equipment. At the end of one traverse the machine may be again 'sumped in' and another transverse cut made along the face of the coal in the opposite direction." (Accent added.)

The salient characteristics disclosed are rotation, meaning the drilling movement of the augers; reciprocation, i. e., a cyclical short forward thrust, with immediate retraction, of the augers; and vertical adjustability, defining the potential of manipulation of the augers upward or downward while in a horizontal posture, as needed. Their usage is illustrated in these excerpts from the specifications:

" * * * the machine of the present invention is particularly adapted to remove material from a relatively low mine face which may include a vein of impure material."

* * * * * *

"It will be understood that where it is desired to dig out a seam of a height higher than the vertical height of the augers themselves, one of the *augers may be raised* relatively to the other so that during the movement of the machine across the mine face, the augers will remove a seam of a height equal to the upper level of the raised auger. At the lateral ends of the seam, the adjacent auger may be either raised or lowered in operation to complete the seam."

"It can thus be seen that there has been provided a continuous mining machine having cutter means which *may be both rotated* and *reciprocated* longitudinally so as to render the same operable both longitudinally and transversely to the coal face * * *." (Accent added.)

It was conceded by the patentee that each of the three distinctive features had appeared earlier in pairs but never in trio. The inventive concept constantly pressed by Wilcox upon the Patent Office was the "combining [of] these three movements in a single cutter". The forgetive and "vital element" asserted by Wilcox, as the District Judge found, was reciprocation. The record fully exposes this to be the burden of the Wilcox contentions throughout.

Wilcox's president testified at trial:

Q. " * * * did you think * * * [reciprocation] was essential to the operation of the machine?"

A. "Yes. Actually this was one of Mr. Wilcox's features of the machine."

* * * * * *

Q. " * * * you believed that you could not successfully cut a vein of coal by rotating augers, pulling the machine across unless you reciprocated those augers, isn't that correct?"

A. "That is correct."

Without reciprocation or its putative equivalent of "critical bit spacing", Wilcox told the Patent Office, the auger cutter could not move transversely and the machine would be inoperable.

In an amendment of the application as late as November 3, 1961, Wilcox again alludes to the indispensability of reciprocation, again claiming the triune of the three features as constituting invention:

"For the sake of argument it can be admitted that *all* of the structure included in the combination which solved the problem is per se old. It is not these *individual* features which solve the problem but a specific combination of them, and it is this combination which is patentable." (Accent added.)

But then Wilcox omits reciprocation from its patent claims, although disclosing it in its specifications. In its place, an equivalent—critical or precise bit spacing—is said to appear in the claims. We detect no such language. Nor could the District Judge. He found

it was not defined, or otherwise identifiable, anywhere in the patent. Consideration of this element is thus precluded, for the deficiency violates the statutory demand for a clear and exact description of the invention. 35 U.S.C. § 112.

Evidently the real reason for leaving reciprocation out of the claims was that Wilcox had learned from a buyer that its miner would operate successfully without the reciprocation. Indeed it had manufactured and sold machines of this type. But by then—1959, almost five years after the application was first filed—the nonreciprocating machine had been in public use for more than a year and Wilcox could not apply for a patent on it. 35 U.S.C. § 102(b).

The machine accused here and known as the Jeffrey unit undoubtedly was calculatedly made in the image of the Wilcox miner but without the ingredient of reciprocation. Thus the Jeffrey comes within the Wilcox claims but not within the specifications of that patent. Relying on this coverage, Wilcox declared infringement by the Jeffrey.

 We hold the apparatus patent of Wilcox invalid.

To begin with, in averring that the Jeffrey trenches upon its claims, Wilcox must be taken as contending that its claims do not include reciprocation, since the Jeffrey has no such movement. If Wilcox does not claim reciprocation, then its patent is void, under 35 U.S.C. § 102 (b), because of the prior successful public use of its miner when without reciprocation.

Next, the patent is void because the claims lack support in the specifications. As already explained, the specifications describe a machine embracing reciprocation, and the file wrapper conclusively reveals that it was the predominant predicate of the Wilcox application. The company cannot now successfully prosecute claims omitting that element.

"[T]he patent monopoly * * * cannot be enlarged by claims in the patent not supported by the description * * *; * * * the applica-

tion for a patent cannot be broadened by amendment so as to embrace an invention not described in the application as filed, at least when adverse rights of the public have intervened." [Citations omitted.] Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 57, 59 S.Ct. 8, 12, 83 L.Ed. 34 (1938). Cf. Snow v. Lake Shore and Michigan Southern Railway Company, 121 U.S. 617, 7 S.Ct. 1343, 30 L.Ed. 1004 (1887).

As was later said in Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 277, 69 S.Ct. 535, 538, 93 L.Ed. 672 (1949):

"We have frequently held· that it is the claim which measures the grant to the patentee. * * * While the cases more often have dealt with efforts to resort to specifications to expand claims, it is clear that the latter fail equally to perform their function as a measure of the grant when they overclaim the invention. When they do so to the point of invalidity and are free from ambiguity which might justify resort to the specifications, we agree with the District Court that they are not to be saved because the latter are less inclusive. * * *" [Citations omitted.]

██ Attempting to rescue the patent, Wilcox would consider as within the claims so much of the specifications as employ reciprocation in describing the machine. The right to refer to the specifications for clarification of the claims cannot be invoked to validate the claims. We said so in Brown v. Brock, 4 Cir., 240 F.2d 723, 728 (1957) with these words of Judge Sobeloff:

"While the claims should be construed in the light of the specification to obtain an understanding thereof, the limitations specified cannot be read into the claims."

Nor can this attempt be justified under 35 U.S.C. § 112 which allows the use of the term "means", as it appears in the Wilcox claims, to bring into the claims of a combination patent any element described in the specifications. For the

introduction is directly contrary to Wilcox's insistent interpretation of its claims—that they cover a machine, such as the Jeffrey, which has no reciprocation.

Thus Wilcox assumes contradictory positions. On one hand, it asks the Court to read reciprocation into the claims in order to preserve the validity of its patent, but on the other hand to read it out in order to find infringement by the Jeffrey.

To permit the patent to stand would mislead the public. The Wilcox claims, if allowed, would exclude machines not employing reciprocation. Since it covers an assemblage of confessedly old constituents, with reciprocation as the keystone, this combination patent would not be invaded by another aggregation which may not include this part of the patented device. Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670, 677 (4 Cir. 1961); Kay Patents Corp. v. Martin Supply Co., 202 F.2d 47, 51 (4 Cir. 1953). Yet although dependent as it is upon reciprocation the Wilcox patent might serve as an in terrorem bar to a similar device without this component in its make-up.

Inasmuch as we vitiate the patent on its face in the light of its representation to the Patent Office and the District Court, we have no occasion to put it to the obviousness tests of Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965). Nor need we weigh the defenses of anticipation or prior art. For the same reasons, commercial success and the other "secondary considerations" are not presently pertinent. Id. 17, 86 S.Ct. 684. We do refer to *Graham*, however, to justify our use of the patent's history. Id. 33, 86 S.Ct. 684.

II. The method patent was applied for June 30, 1960, a bifurcation of the original application. After amendments thereto, the patent issued as No. 2,967,701 on January 10, 1961. In the specifications it at once advises that "This invention relates to mining *methods* and more particularly to mining *methods* of the continuous type in which the coal or other material being mined is continuously conveyed away from the mine face". Its single claim is of "a *process* of continuous short wall coal mining * * *." The words now underlined in these quotations emphasize that it is not an apparatus patent despite that one of the specifications says, "It can thus be seen that there has been provided a continuous mining machine * * *."

In truth, this patent's "method" and "process" is fitted to the Wilcox apparatus. The machine it covers is specified in the same terms as is the Wilcox miner patent. It too prescribes reciprocation in the specifications, but the method or process claim contains no allusion to this element. Hence, it must be faulted for the same flaws found in the apparatus patent. Actually, however, this is not a method or process patent. It is merely a statement of how the Wilcox machine is to be operated. Directions of this sort are not patentable. Chisholm-Ryder Co., Inc. v. Buck, 65 F.2d 735, 736 (4 Cir. 1933).

The decree of the District Court will be approved.

Affirmed.